**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| MICHELE VULCANO HALL | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 10-7603 |
| | : | |
| EASTON AREA SCHOOL DISTRICT, | : | |
| SUSAN MCGINLEY AND JOHN | : | |
| CASTROVINCI | : | |
| Defendants. | : | |

_____:


Goldberg, J.                                                                                    May 5, 2014

<u>**Memorandum Opinion**</u>

## I.        <u>INTRODUCTION</u>

Plaintiff Michele Vulcano Hall brings this discrimination action against Defendants Easton Area School District, Susan McGinley, and John Castrovinci.  Plaintiff's Second Amended Complaint alleges discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 <u>et</u> <u>seq</u>. ("ADA") (Count I); retaliation in violation of the ADA (Count II); discrimination and retaliation in violation of the Pennsylvania Human Relations Act, 43 P.S. §§ 951 <u>et</u> <u>seq</u>. ("PHRA") (Count III); denial of equal protection in violation of 42 U.S.C. § 1983 (Count IV); denial of due process in violation of § 1983 (Count V); and tortious interference with contractual relations (Count VI).

Presently before the Court is Defendants' motion for summary judgment.  For the reasons discussed below, we will grant the motion.

II.      **FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are undisputed unless otherwise indicated:

In August 2008, Plaintiff was hired as a teacher under an emergency permit by Defendant Easton Area School District ("District").   At that time, Defendant Susan McGinley was the District's superintendent and Defendant John Castrovinci was director of human resources. (Second Am. Compl. ¶ 8; Defs.' Stmt. of Facts ¶¶ 2-3.)

Plaintiff, who did not have a teaching certification, was enrolled in a "condensed practicum" program at Rider University in New Jersey.   This program, along with her completion of Pennsylvania's state testing requirements, would eventually allow Plaintiff to obtain her teaching certification.  (Second Am. Compl. ¶ 8.)

Because a Pennsylvania state certification was required of all teachers, the District applied to the Pennsylvania Department of Education ("DOE") for an emergency permit on Plaintiff's behalf.  Specifically, the District applied for what is termed as a "Vacant Position (Type 01)" permit, which allows a school district to fill a vacant position with a non-certified applicant who is actively participating in an educational program that would lead to certification. This type of permit may only be issued when no certified applicant is available for the position. (Defs.' Stmt. of Facts ¶ 6; 22 Pa. Code § 49.31; Department of Education Certification Staffing Policies and Guidelines ("CSPG") No. 13, (June 5, 2008).)  Emergency permits are valid for one school year and are renewable at the request of the district and approval of the DOE when the teacher has met certain educational conditions or, when those conditions are not met, under extenuating circumstances.  (CSPG No. 13.)

Plaintiff contends that Castrovinci informed her at the time of her hiring that she would have up to three years to obtain her teaching certification while she worked, which would allow her to complete her educational requirement, pass a test called the Praxis exam, which is a condition of certification in Pennsylvania, and transfer the New Jersey certification that she would receive as a result of her enrollment at Rider to a Pennsylvania certification.[1]  (Pl.'s Stmt. of Facts ¶ 55.)

In April 2009, the District's school board adopted revisions to its "Policy 404," which governed employment of professional employees, including requirements for teacher certifications.  (Defs.' Stmt. of Facts ¶¶ 7-9.)  Prior to these revisions, Policy 404 required that all applicants for teacher positions be certified, but made no mention of emergency permits. (Pl.'s Ex. O at Bates no. 76.)  As revised, Policy 404 recognized the need to employ persons on an emergency basis when no certified applicant was available, but limited the term of employment of teachers working on emergency status to one school year.  (McGinley Dep. Ex. 5 at p. 89.)  The District claims that these revisions were undertaken so that its policies were consistent, and in compliance with state law and DOE guidelines.  On April 27, 2009, Castrovinci informed Plaintiff of the changes to Policy 404 and told her that if she did not receive her full certification by the year's end, her position would be posted to the District's website and a certified applicant would be sought to fill it.  (Hall Dep. Ex. 6.)

---

[1]  Castrovinci's administrative assistant, Lori Fulmer, testified that she informed Plaintiff upon her hiring that her emergency certificate would be valid for one year.  (Fulmer Dep. at p. 29.) Castrovinci testified that he did not recall a specific conversation with Plaintiff at the time she was hired, but that they discussed securing an emergency certificate, which would be valid for one year.  (Castrovinci Dep. at p. 30.)  As explained infra, this non-material factual dispute does not defeat Defendants' motion.  Plaintiff's contract was subject to the provisions of the School Code—as are all teacher contracts—including its directives on emergency certification.  (Pl.'s Ex. N at Bates no. 373.)

Shortly after receiving this notification, Plaintiff wrote to the District requesting accommodations under the ADA that would provide her with additional time to secure her certification.  Plaintiff made this request because she had been diagnosed with dyslexia and other learning disabilities, which requires that she be provided with more time than most people to complete testing and educational requirements.  (Second Am. Compl. ¶ 4.)  Plaintiff took the Praxis exam prior to the year's end but failed.  (Defs.' Stmt. of Facts ¶ 29.)  She was unable to secure her certification before the school year ended and thus the District posted her job to its website.  Thereafter, Plaintiff was replaced with an applicant who held an Elementary K-6 teaching certification.  (Defs.' Stmt. of Facts ¶ 23; Pl.'s Stmt. of Facts ¶ 23.)

Plaintiff claims that Policy 404 was revised specifically to facilitate her termination.  Plaintiff's father, Dr. Pat Vulcano, was a school board member throughout the time period at issue.  Plaintiff urges that as a result of the relationship with her father, her hiring was a matter of public controversy and that Defendants McGinley and Castrovinci orchestrated her termination out of hostility toward Dr. Vulcano.[2]  She further alleges that by refusing her additional time to complete her educational and testing requirements, Defendants denied her reasonable accommodations required by the ADA.

---

[2] At oral argument on Defendants' motion, held on April 25, 2014, Plaintiff's counsel was asked to point to all evidence of record establishing that Plaintiff's termination was connected to ill feelings towards her father.  Counsel responded that some of the school board members involved in revising Policy 404 were political rivals of Plaintiff's father, including one board member who testified that he ran for the same seat as Dr. Vulcano.  Counsel also noted generally that the board had information about how potential revisions would affect particular employees during the drafting process.  Counsel also pointed to the fact that the board rejected drafts of the revisions that would have allowed Plaintiff to continue in her position.  (Oral Arg. Tr., Apr. 25, 2014 at pp. 22-26.)  We do not find the sort of political rivalries that invariably characterize school boards, nor the fact that the board considered multiple drafts along with information about their effects to be sufficient evidence to establish that the decision to revise Policy 404 was driven by personal animus toward Plaintiff or her father.

Plaintiff filed her complaint on December 30, 2010. We dismissed several of Plaintiff's claims on February 16, 2012. She filed a Second Amended Complaint on February 29, 2012. Defendants now move for summary judgment.

## III.   **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1)(A).

## IV.   <u>DISCUSSION</u>

### A.  Count I – ADA Discrimination

Defendants move first for judgment on Plaintiff's ADA discrimination claims.  The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.  Discrimination under the ADA includes not only adverse action motivated by prejudice or fear of disabilities, but also failing to make reasonable accommodations for a plaintiff's disabilities.  <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999). Defendants argue that (1) Plaintiff was not a "qualified individual" under the ADA at the time of the alleged discrimination and that (2) even if she was, she did not request reasonable accommodations that the District was capable of granting.

While we find sufficient evidence exists to establish that Plaintiff was a qualified individual, we will nonetheless grant summary judgment on Count I, as Plaintiff cannot show she was denied reasonable accommodations.

1.      Qualified Individual

A qualified individual is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position[.]"  42 U.S.C. § 12111.  To determine whether a person is qualified, a two-part test is used: "[f]irst, a court must consider whether 'the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" and second, "'whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.'"   Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1988) (quoting 29 C.F.R. pt. 1630, App. at 353-54).  The parties do not dispute that Plaintiff could perform the essential functions of the job and agree that she performed well as a teacher.  Defendants contend however that because Plaintiff's emergency permit had lapsed, she failed to meet the legal prerequisites of the job and was therefore no longer qualified at the time her position was posted.

We disagree with Defendant because the alleged discriminatory acts in this case occurred at a time when Plaintiff was still working under a valid emergency permit.  An emergency permit is valid through the end of the summer school period following the academic year in which it is issued.  22 Pa. Code § 49.33.  Plaintiff's permit lists July 31, 2009 as its expiration date.  (Pl.'s Ex. N at Bates no. 154.)  The revisions to Policy 404, Plaintiff's request for additional time, and the posting of her position occurred between April and early June of 2009.  Thus, even accepting Defendants' position that the emergency permit expired at the end of the regular school year, rather than the end of the summer school term, Plaintiff was still working under a valid permit, and thus was "qualified," when she requested accommodations and when the District posted her

job.  Defendants cite cases in which courts have held that teachers who were terminated or suspended upon the expiration of their certificates were not qualified individuals for the purposes of the ADA, but none in which the discriminatory action was taken at a time when a certificate was still valid.[3]  Accordingly, we find Plaintiff was a qualified individual during the relevant time period.

### 2.   Reasonable Accommodation

A qualified individual has the burden of identifying an accommodation whose costs do not clearly exceed its benefits.  Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 670 (3d Cir. 1999).  Once he or she has done so, the burden shifts to the employer to demonstrate either that the proposed accommodation is unreasonable or that it would impose an undue hardship.  Id.  In practice, proving that an accommodation is unreasonable and proving that it imposes an undue hardship amount to the same thing.  Id.

Defendants first argue that Plaintiff never requested reasonable accommodations, and assert that because her correspondence did not request accommodations that the District was capable of granting, she had not made a proper request under the ADA.  A request for reasonable accommodations need not be formal, but must make the employer aware that the employee wants help for her disability.  Taylor, 184 F.3d at 313.  Thus, Plaintiff's letter, in which she identified herself as disabled and asked for reasonable accommodations satisfied this requirement and triggered Defendants' responsibilities to engage her.

---

[3] See Falchenberg v. NYS Dept of Ed., 375 F. Supp. 2d 344, 348 (S.D.N.Y. 2005) (finding that a plaintiff who declined to take certification test and thus failed to obtain certification was not a qualified individual); Johnson v. Board of Trustees of Boundary County School District, 666 F.3d 561, 566-67 (9th Cir. 2011) (finding that a plaintiff whose certificate lapsed when she failed to complete required training due to major depressive episode was not a qualified individual).

Defendants responded to this letter by requesting more information about Plaintiff's disability. Plaintiff provided this information via a letter from education specialist Ferdinand Luciano, who had evaluated her and recommended accommodations for educational and test-taking settings.  The parties agree, however, that these accommodations were not within the District's power to grant.

Ultimately, the only accommodation the District could have granted that would have allowed Plaintiff to continue in her position would have entailed applying for renewal of her emergency permit so that she would have more time to complete her education and testing requirements.  Whether Defendants' refusal to renew Plaintiff's emergency permit was impermissible is one of the central issues before us.  Defendants urge that this accommodation was not possible because it would have run afoul of local and state law and DOE guidelines. Plaintiff responds that those laws and guidelines allowed the District to apply for a renewal of her emergency permit, and that the ADA in fact required them to do so as a reasonable accommodation.

After careful consideration of applicable state law, the DOE guidelines, and Defendants' written policies, we find that that Defendant could not comply with Plaintiff's requests and thus did not violate the ADA.  This is because the District was required to make a continued effort to fill Plaintiff's position with a certified applicant—specifically by posting it to the District website—before it could apply for a renewal of Plaintiff's "Type 01" permit.  Thus, Plaintiff's request was, as a matter of law, unreasonable and imposed an undue hardship on the District.

The Pennsylvania Code sets forth state law governing emergency permits.  22 Pa. Code §§ 49.31-34.   Section 49.31 provides that "The Department [of Education] may issue an

emergency, Long-Term or Day-to-Day Substitute Permit for service in the public schools, at the request of the employing public school entity, to an applicant who is a graduate of a 4-year college or university to fill a vacant position or to serve as a long-term or day-to-day substitute teacher, <u>when a fully qualified and properly certificated applicant is not available</u>." 22 Pa. Code § 49.31 (emphasis added). The code further states that "[a] long-term substitute permit may be issued only after the position has been posted a minimum of 10 days on the school entity's website and no qualified candidate has been identified." <u>Id.</u>  Section 49.33 notes that "[e]mergency, Long-Term and Day-to-Day Substitute Permits expire with the termination of any summer school conducted which follows the date of issuance." 22 Pa. Code § 49.33.

We recognize that Plaintiff was issued a Vacant Position permit rather than a Long-Term Substitute permit, and as such, § 49.31 does not expressly apply to her "Vacant Position (Type 01)."  However, § 49.33 allows for the issuance of any type of emergency permit only in the absence of a properly certified, qualified applicant.  Thus, this statute supports Defendants' position that it was required to post Plaintiff's position.  Examination of the DOE Certification and Staffing Policies and Guidelines further supports this argument.

CSPG No. 13 addresses in further detail the issuance of emergency permits and sets forth the procedures governing their renewal.  First, under the heading of "General Policies," CSPG 13 provides that "[i]n the case of a permanent opening (vacant position), the school entity <u>must</u> continue to make every effort to fill the vacancy with a fully qualified and properly certified professional employee," except in two instances, neither of which applies here.  CSPG No. 13 (June 5, 2008) (emphasis added).

Next, CSPG 13 sets forth the procedures governing the issuance and renewal of four types of emergency permits—Vacant Position (Type 01) (issued to Plaintiff), Long-Term Substitute (Type 04), Day-to-Day Substitute (Type 06), and Teacher Exchange/Cultural Exchange (Type 08).

In the section governing the Vacant Position (Type 01) permit, the guidelines state that the permit is intended to fill a vacancy "when there is a consistent and persistent inability to fill a position with a fully qualified and properly certified individual." Id. Under "Subsequent Application Requirements" for "Vacant Position (Type 01)" permits, CSPG 13 provides that "[t]he school entity is required to post any long-term substitute position for a minimum of 10 days on the school entity's website.  If no qualified candidate has been identified, a Type 01 permit application may be submitted." Id.[4]

With the Pennsylvania Code and Department of Education guidelines on emergency permits in mind, we turn to the District's revision of Policy 404.  Prior to the revisions, Policy 404 required that "[a]ll applicants must be certified at the time of application; no candidate for

---

[4] Like § 49.31, this provision requires posting "long-term substitute" positions, not vacant positions, to the school entity's website.  However, the provision provides that if such posting does not attract a certified applicant, a school entity may submit a Vacant Position (Type 01) permit application, rather than a Long-Term Substitute (Type 04) application as would be expected to fill a long-term substitute position.  Indeed, the "Subsequent Application Requirements" for a Long-Term Substitute (Type 04) permit similarly require posting any long-term substitute position, and if no certified candidate is found, allow the school entity to submit a Type 04 permit application.  In 2010, the "Subsequent Application Requirements" for Vacant Position (Type 01) permits were revised to read: "[t]he school entity is required to post any vacant position…." CSPG No. 13 (Sept. 1, 2010) (emphasis added).  While the revised guidelines were not in effect at the time of Plaintiff's termination, the foregoing leads us to conclude that the guidelines always intended that a school entity post any position filled with either a Vacant Position (Type 01) or Long-Term Substitute (Type 04) permit before applying for a renewal.

professional employment shall receive recommendation for such employment without evidence

of his/her certification." (Pl.'s Ex. O at Bates no. 51.) The 2009 revisions added the following:

> The Board recognizes that it may be necessary to employ emergency certified teachers due to a limited number of properly certified applicants for specific professional positions. The Board reserves the right to determine, based on the recommendation from the Director of Human Resources, the specific professional positions for which the employment of an emergency certified individual may be required. <u>With board approval, the emergency certified professional employee may be employed as a long-term substitute with a term of employment not to exceed the end of the current school year in which the candidate is employed</u>.

(McGinley Dep. Ex. 5 at p. 89) (emphasis added).

The above language clearly reflects that the hiring of emergency certified teachers is

dependent upon there being a "limited number of properly certified applicants." <u>Id.</u> The

language also definitively states that the term of employment may not exceed one year. Thus,

read in its entirety, this paragraph is consistent with the Pennsylvania Code and the CSPG

mandate that emergency permits—regardless of type—are only proper when certified applicants

are not available, that the duration of the emergency permit is not unlimited, and that the District

must attempt to fill positions with certified applicants for each school year. [5]

In light of all of the above, we find as a matter of law, that the District was required to

post Plaintiff's position in an effort to fill it with a certified individual. Thus, applying for a

renewal of Plaintiff's emergency permit cannot be considered a reasonable accommodation

under the ADA. Precedent confirms this conclusion and instructs that the purpose of an

emergency permit is to allow school districts to fill positions for which there are no fully-

certified applicants, not to accommodate teachers like Plaintiff who have not obtained their

---

[5] We note that, like § 49.31 and CSPG No. 13, the revised Policy 404 employs the term "long-term substitute." However, we find that when read in conjunction with all of the applicable law, the provision clearly applies to all emergency certified employees.

certification.  See Koger v. Allegheny Intermediate Unit, 495 Fed.Appx. 266, 267 (3d Cir. 2012) ("The emergency permit is an exception to the requirement that all teachers in public schools must be properly certified."); Dungee v. School Dist. Of Philadelphia, 2008 WL 4140403, at *3 (E.D. Pa. Sept. 5, 2008) ("The purpose of the emergency permit is to serve the needs of the school district—not an individual.").

It also cannot be forgotten that the Praxis exam was not Plaintiff's only outstanding requirement.  In order to complete her program at Rider, Plaintiff had to be observed in a teaching environment by the Rider education office.  Then, because completion of the Rider program would have led to the issuance of a New Jersey certificate, Plaintiff would have to apply to the DOE to transfer her certificate to Pennsylvania.  In other words, Plaintiff's disability, which may have kept her from passing the Praxis exam, was not the only factor preventing her from obtaining certification before the school year's end.  Even without the testing requirements, the structure of Rider's condensed practicum simply did not allow Plaintiff to earn her certification in time to comply with the revised Policy 404.  Her request for more time was an accommodation that anyone in her position—disabled or not—would have required.  The District was thus not obligated to grant that accommodation rather than seek fully-certified applicants.  Accordingly, we will grant judgment in Defendants' favor on Count I.

### B.  Count II - ADA Retaliation

Plaintiff also claims that Defendants retaliated against her in several ways for engaging in protected activity under the ADA.  She alleges that retaliation occurred through Defendants' refusal to communicate with her; making it more difficult for her to keep her job; posting her job and not considering her in the hiring process; firing her; failing to notify her of her employment

status or benefits coverage; misrepresenting the facts of her employment to the state agencies; and subjecting her to a generally hostile work environment.  (Second Am. Compl.        ¶ 22.)

A retaliation claim under the ADA follows the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  First, a plaintiff must establish a prima facie case of retaliation by showing (1) she engaged in protected activity; (2) the employer took adverse action against her either after or contemporaneous with the protected activity; and (3) a causal connection between the protected activity and the adverse action.  <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 187 (3d Cir. 2003).  Once an employee has demonstrated a prima facie case of retaliation, the burden shifts to the employer to advance a legitimate, non-discriminatory reason for the action.  <u>Id.</u>  If it can do so, the burden returns to the employee, who must prove that "retaliatory animus" played a role and had a determinative effect on the outcome of the decision-making process.  <u>Id.</u> (quoting <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 501 (3d Cir. 1997).

It is clear that Plaintiff engaged in protected activity when she requested accommodations under the ADA.  However, Plaintiff fails to identify any adverse action taken against her as a result.  As explained <u>supra</u>, the allegations that Defendants made it harder for Plaintiff to keep her job, that they posted her job without considering her for the position, and that they fired her allege conduct undertaken by the District pursuant to Policy 404 and required by state law.  Thus, these actions cannot form part of Plaintiff's prima facie case for retaliation.

Plaintiff also alleges that Defendants refused to communicate with her regarding her requests for accommodations, yet the record reflects numerous communications between Defendants, Plaintiff and Plaintiff's counsel.[6]  As to the allegations that Defendants failed to

---

[6]  <u>See</u> Hall Dep. Exs. 6-8, 10, 12; Pl.'s Ex. N at Bates no. 377.

communicate with Plaintiff regarding the status of her employment, while the record does not clearly show the manner in which Plaintiff was terminated or notified of her termination, it does reflect that she was informed through her attorney that the position had been filled with a certified applicant, and that Plaintiff could continue to work as a day to day substitute for the 2009-10 school year.[7]   (Hall Dep. Ex. 13.)   In short, Plaintiff cannot show that Defendants retaliated against her for identifying herself as disabled or requesting accommodations. Therefore, we will grant judgment in Defendants' favor on Count II.[8]

### C.  Count IV – Equal Protection

Plaintiff also alleges that Defendants violated § 1983 by denying her equal protection. "To bring a successful claim under § 1983 for a denial of equal protection in violation of the Fourteenth Amendment, a plaintiff must prove the existence of purposeful discrimination, that is, he must demonstrate that he received different treatment from that received by other similarly situated individuals."   Chambers Ex. rel. Chambers v. School Dist. of Philadelphia Board of Educ., 587 F.3d 176, 196 (3d Cir. 2009) (citation omitted).   Plaintiff's equal protection claim rests on two bases: that she was treated differently (1) because of her disability and (2) because of her association with her father.

---

[7]  Plaintiff also alleges that Defendants interfered with her receipt of unemployment compensation, misrepresented her employment status to state agencies and subjected her to a generally hostile work environment.  However, she fails to point to portions of the record, either in her response or in her statement of facts, to support those claims.

[8]  Count III alleges discrimination and retaliation in violation of the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et seq.  While Defendant does not address this count, "[t]he PHRA is basically the same as the ADA in relevant respects[.]"  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002).   Accordingly, our ruling with respect to Plaintiff's ADA claims applies to her PHRA claims as well.

Although protected by statutes such as the ADA, the Supreme Court has held that disabled people are not a constitutionally protected suspect class for purposes of equal protection challenges. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Allegations of differential treatment based on disability are therefore subject to a rational basis standard upon review, which requires that any differential treatment based on disability is supported by "a rational relationship between the disparity of treatment and some legitimate governmental purpose." Heller v. Doe, 509 U.S. 312, 320 (1993). On the other hand, Plaintiff's claim that she was treated differently because of her relationship with her father implicates fundamental associational rights protected by the First Amendment. Any differential treatment that impinges on a fundamental right is subject to strict scrutiny and must be narrowly tailored to achieve a compelling governmental purpose. Abdul-Akbar v. McKelvie, 239 F.3d 307, 317 (3d Cir. 2001). Here, we find that Plaintiff has failed to demonstrate that she was treated differently than similarly situated people.

As discussed supra, all teachers were subject to the revised Policy 404. While Plaintiff argues that the revisions were narrowly tailored to apply to her alone, she does not contest Defendants' assertion that other employees were in fact affected by the change, and that the majority either obtained their full certifications or resigned their positions voluntarily. Thus, Plaintiff cannot show that she was treated differently than similarly situated individuals.

Defendants do acknowledge that the District applied for a renewal of the emergency certification of a single employee—the school nurse. Plaintiff contends that applying for a renewal for the nurse, while refusing to do so for her demonstrates that she was singled out for termination. Defendants, however, claim that fully-certified school nurses are rare, and that

while the district posted the position in accordance with the revised Policy 404, they were unable to find a qualified applicant.

Plaintiff does not contest the assertion that no qualified nurses were available, nor does anything on the record contradict this fact. Plaintiff argues that she was similarly situated to the school nurse in that no fully-certified applicants applied for Plaintiff's job when it was posted, and thus she was similarly entitled to a renewal of her emergency certification. Plaintiff suggests that Defendants' evidence to the contrary—consisting of the list of applicants for Plaintiff's position along with their certifications—is fabricated. This position is, however, contradicted by the undisputed fact that a certified individual was ultimately hired to fill Plaintiff's position for the 2009-10 school year.[9]

Plaintiff also argues that the revisions to Policy 404 were unjustified due to the small number of teachers working on emergency certifications. However, that determination falls within the purview of the school board, which unanimously adopted the revisions. Similarly, Plaintiff's numerous alternative proposals for treating teachers working on emergency certifications represent paths that Defendants could have taken, but do not establish that the

---

[9] Plaintiff asserts that the Certification Staffing Policies and Guidelines require the person filling her position to hold an instructional certification in "Business-Computer-Info Tech K-12," which was the designation of Plaintiff's emergency certification, while her replacement held only a general "Elementary K-6" certification. Defendants deny that an instructional certification was required for the position at the time Plaintiff's replacement was hired. There is no evidence on the record to establish that the instructional certification in question was required for the position when Plaintiff's replacement was hired. More importantly, Plaintiff's instructional certification was valid only until the expiration of her emergency permit, requiring the District to seek a certified applicant to fill the position.

board's chosen action was improper or that it subjected Plaintiff to differential treatment.[10] Accordingly, we will grant judgment in Defendants' favor on Count IV.

### D. Count V - Due Process

Count V alleges that Plaintiff was denied notice, a hearing and explanation of the evidence supporting her termination, which amounts to a denial of procedural due process.

To establish a deprivation of procedural due process, a plaintiff must demonstrate that: (1) she was deprived of an individual interest encompassed by the Fourteenth Amendment's protection of life, liberty or property and that (2) procedures available did not provide due process of law. Iles v. de Jongh, 638 F.3d 169, 173 (3d Cir. 2011). The question of whether an employee has a property right in continued employment is one of state law. Id.

Plaintiff was hired as a "temporary professional employee" pursuant to her contract. (Pl.'s Ex. O at Bates no. 76.) While the Pennsylvania School Code states that temporary professional employees cannot be terminated unless they are rated unsatisfactory and given written notice of such rating, state law and Department of Education staffing guidelines also establish that proper certification is necessary to perform the professional duties of a teacher, irrespective of status as a temporary employee. 24 P.S. § 11-1108; CSPG 1 ¶ 6. Courts have held that a Pennsylvania teacher whose certificate has lapsed ceases to be a professional

---

[10] Plaintiff contends, among other things, that the District could have maintained a practice of applying for renewals of emergency certifications annually; that Policy 404 could have included grandfathering language pertaining to those already working on emergency certifications; and that the District could treat employees with emergency certifications in the same manner it did employees working on intern certificates.

An intern certificate may be issued one time to an individual enrolled in an approved intern program, which, when completed, leads to full certification. The intern certificate is valid for three years provided the candidate meets educational requirements. 22 Pa. Code § 49.91-92. The District took the position that an intern certificate is a valid certification for a professional employee and those holding one would not have their positions posted pursuant to the revisions to Policy 404. (Castrovinci Dep. At p. 11.)

employee and thus has no expectation in continued employment.  Moiles v. Marple Newtown Sch. Dist., 2002 WL 1964393, at *7 (E.D. Pa. Feb. 13, 2008); Occhipinti v. Bd. of Sch. Dirs. of Old Forge Sch. Dist., 464 A.2d 631, 632 (Pa. Commw. Ct. 1983).

Plaintiff argues that because she was entitled to renewal of her certification under state law, she had a right to continued employment and thus due process.  We reject this argument because state law allows, but does not require a district to apply for renewal of an emergency certification.  Still, unlike the numerous cases in which teachers whose certificates had lapsed at the time they suffered adverse employment action, here, Plaintiff's emergency certification was valid at the time the District posted her job.  While there was no dispute amongst the parties that Plaintiff would not be able to satisfy the requirements necessary to obtain her full certification prior to the start of the 2009-2010 school year, she was nonetheless properly working under an emergency certification at the time her position was posted, and thus was entitled to some degree of due process before her position could be filled by another applicant.

"At bottom, procedural due process requires notice and an opportunity to be heard."  McCarthy v. Darman, 372 Fed.Appx. 346, 350 (3d Cir. 2010) (citation omitted).  The level of due process required is determined by balancing three factors: (1) the private interest at stake, (2) the risk of erroneous deprivation and (3) the government's interest.  Id. (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).  Due process normally requires a pre-termination hearing providing at least "the opportunity to present reasons, either in person or in writing, why proposed action should not be taken."  Cleveland Board of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).

Plaintiff alleges that she was deprived of notice, a hearing and explanation of the evidence against her.  The record, however, reflects ongoing correspondence between the parties regarding the impact of revised Policy 404 on Plaintiff, in which she was able to present her view on the effects of her disability, her program at Rider and her contract on her future employment.[11]

As an employee at the time her job was posted, Plaintiff had an interest in the process. Similarly, the District had an interest in employing certified teachers.  Because posting Plaintiff's job was carried out pursuant to the revised Policy 404, and because there was no disagreement amongst the parties that Plaintiff would not obtain her full certification in time, the risk of erroneous deprivation was low.  Upon balancing these factors and closely reviewing the record regarding the correspondence between the parties, we find that no reasonable jury could find that the due process requirements were not satisfied.  Accordingly, we will grant judgment in Defendants' favor on Count V.

---

[11] The record reflects at least the following communications: On April 27, 2009, Plaintiff was contacted by Castrovinci and notified of the changes to Policy 404 and the requirement that she obtain certification or lose her position; on May 11, 2009, Plaintiff's attorney wrote to McGinley and school board president Patricia Fisher explaining Plaintiff's educational requirements and her belief that her contract entitled her to continued employment; the following day, Castrovinci wrote to Plaintiff requesting documentation regarding Plaintiff's progress toward certification, which Plaintiff later provided; Plaintiff wrote to Castrovinci a day later, explaining that she required more time to complete her certification requirements due to her disabilities; on May 26, 2009, Plaintiff's father forwarded an email from the acting associate dean of Rider to McGinley, detailing the requirements of the academic program that would lead to Plaintiff's eventual certification; on June 12, 2009, an attorney for the District wrote to Plaintiff's attorney explaining the District's position on Plaintiff's contract and requesting information on her disability; and on August 27, 2009, Ferdinand Luciano wrote to Castrovinci regarding his evaluation of Plaintiff's disabilities and accommodations that could help her in certain settings. (Hall Dep. Exs. 6-8, 10, 12; Pl.'s Ex. N at Bates no. 377.)

### E.  Count VI - Tortious Interference with Contract

Count VI of the Second Amended Complaint alleges that Castrovinci and McGinley tortiously interfered with Plaintiff's employment contract.  To prevail on a tortious interference claim, Plaintiff must show: "(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; [and] (4) legal damage to the plaintiff as a result of the defendant's conduct[.]" Acumed LLC v. Advanced Surgical Services, Inc., 561 F.3d 199, 212 (3d Cir 2009).  Normally, because a school district acts through its officials, those officials are not considered third parties and therefore cannot be held liable for tortious interference.  Forrest v. Owen J. Roberts Sch. Dist., 2011 WL 1549492, at *16 (E.D. Pa. April 1, 2011).  School district officials can be held liable only when they act outside the scope of their employment.  Id.

All of the allegations against the individual Defendants involve conduct within their official capacities as school officials, and thus Defendants are not liable for tortious interference. Castrovinci's conduct includes conferring with the school board regarding Policy 404 and meeting with teachers potentially affected by it, which falls within the scope of his job as human resources director.  The allegations against McGinley are less specific, but similarly lack any claims of conduct outside of her capacity as superintendent.

Plaintiff points to the fact that Defendants posted her job on the same day McGinley received an email from Plaintiff's father, which she forwarded to Castrovinci, as evidence of their personal animus.  However, Dr. Vulcano's email simply forwarded confirmation from

Rider that Plaintiff would be unable to complete her coursework and other educational requirements before the beginning of the 2009-10 school year, which would have had the effect of confirming that Policy 404 required the District to post her position. The coincidence of these two events fails to create a factual issue sufficient to submit to a jury that Defendants' motives were personal.

### F.  Qualified Immunity

Finally, we find that even if there had been a violation of Plaintiff's rights, the individual Defendants Castrovinci and McGinley are entitled to qualified immunity as government officials. "Government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  While Castrovinci and McGinley both played a role in changing the District's policy regarding certification, and Castrovinci subsequently participated in decision-making pertaining to Plaintiff specifically, the policy change has sufficient basis in Pennsylvania law and staffing guidelines that Defendants cannot be said to have known that they would be violating any clearly established rights by implementing it.

### V.   CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment will be granted.

An appropriate order follows.